IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

MARTY E. ALLRED            )
                           )
v.                         )     No. 2:06-0007
                           )     Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION  )


To:  The Honorable John T. Nixon, Senior Judge


### REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3), to obtain judicial review of the final

decision of the Commissioner of Social Security denying plaintiff

disability insurance benefits ("DIB") and supplemental security

income ("SSI"), as provided under Titles II and XVI of the Social

Security Act ("the Act"), as amended.  The case is currently

pending on plaintiff's motion for judgment on the administrative

record and supporting memorandum (Docket Entry Nos. 17, 18), to

which defendant has responded (Docket Entry No. 19).  Plaintiff

has further filed a reply to defendant's response (Docket Entry

No. 20).

        On February 25, 2008, the case was transferred to the

docket of the undersigned Magistrate Judge (Docket Entry No. 21).

Upon consideration of these papers and the transcript of the

administrative record, and for the reasons given below, the

undersigned recommends that plaintiff's motion be **GRANTED**, and

1

that the decision of the Commissioner be **REVERSED** and the cause **REMANDED** for further administrative proceedings consistent with this report, to include rehearing.

## I. Introduction

Plaintiff filed a DIB application on December 28, 2000, alleging disability as of June 19, 2000 (Tr. 100-02). This application was denied at the initial stage of agency review on March 7, 2001 (Tr. 65-66). Plaintiff thereafter filed another DIB application, as well as his SSI application, on August 20, 2001, again alleging disability as of June 19, 2000 (Tr. 104-06, 881-83). These applications were denied at the initial and reconsideration stages of agency review (Tr. 67-70, 884-85, 891-92).

Plaintiff subsequently requested and received a *de novo* hearing before an Administrative Law Judge ("ALJ"). The hearing was held on December 18, 2003, when plaintiff appeared with counsel and testimony was received from plaintiff, his witness, and a vocational expert. (Tr. 25-64) The ALJ took the case under advisement until May 21, 2004, when he issued a written decision (Tr. 17-24) denying plaintiff's applications and finding him "not disabled" under the Act. The decision contains the following enumerated findings:

1. The claimant met the insured status requirements of Title II

2

of the Social Security Act as of June 19, 2000, and continues to meet them through the date of this decision.

2.  The claimant has not engaged in any substantial gainful activity since June 19, 2000, the alleged onset date of disability.

3.  The evidence establishes that the claimant has a severe combination of impairments which includes a lumbar laminectomy, anxiety, diabetes mellitus, and a history of muscle strains, but that he does not have any impairment or combination of impairments of the level of severity required by 20 CFR Part 404, Subpart P, Appendix 1.

4.  The evidence establishes that the claimant has not experienced any pain or other symptomatology of a disabling level of severity on an ongoing basis.

5.  The claimant retains the capacity to perform a limited range of light work in nonhazardous environments with 6 hours of walking/standing during an 8-hour workday, lifting of up to 10 pounds, 6 or more hours of sitting during an 8-hour workday, no exposure to temperature extremes or excessive humidity, and moderate limitations in understanding, remembering, and carrying out detailed job instructions, maintaining concentration and attention for extended periods, interacting with supervisors and the general public, setting goals and planning work, making adaptations to changes in the work environment, and completing a normal workday without interruptions caused by psychological symptoms.

6.  The claimant cannot perform his vocationally relevant past work.

7.  The claimant is a younger individual.  20 CFR 404.1563 and 416.963.

8.  The claimant has a limited education and is literate.  20 CFR 404.1564 and 416.964.

9.  The claimant has performed some skilled or semiskilled work during his vocationally relevant past, but his job skills are not transferable to light work.  20 CFR 404.1568 and 416.968.

10. If the claimant had the capacity to perform the full range of light work, section 404.1569 of Regulations No. 4 and

3

section 416.969 of Regulations No. 16, and Rule 202.18, Table No. 2 of Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion that he is not disabled.

11. Although the claimant's limitations do not allow him to perform the full range of light work, using the above-cited rule as a framework for decisionmaking, there are a significant number of jobs in the economy which he could be expected to perform. Examples of such jobs are product inspector, companion, table assembler, and grader/sorter. The vocational expert indicated that there are about 28,700 of the named sample jobs in existence in the local economy; a significant number of jobs.

12. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of (Tr. his decision. 20 CFR 404.1520(f) and 416.920(f).

(Tr. 23-24)

On November 9, 2005, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 7-9), thereby rendering that decision the final decision of the Commissioner. This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive. Id.

## II. Review of the Record[1]

The plaintiff, Marty Allred, is a 43-year old man with a limited (seventh grade) education. (Tr. 28) He was in special

---

[1]The following summary of the record is taken from plaintiff's brief, Docket Entry No. 18 at 2-8.

4

education classes. (Tr. 120) Mr. Allred alleges disability since June 2000 due to cervical and lumbar impairments and associated pain, seizures, diabetes, fissures on his feet, right knee pain, and anxiety. In the vocationally relevant past, Mr. Allred worked as a meat trimmer and a heating and air conditioning installer, both jobs classified by the vocational expert as being at the heavy exertional level. (Tr. 59)

A. Medical Evidence

Physical problems

Mr. Allred began experiencing neck pain after an accident at work in June 2000. (Tr. 246-47, 251, 253, 256, 264-68, 273, 690-91) In July 2000, he started seeing Dr. Jean-Francois Reat, an orthopedic surgeon, for persistent pain and stiffness in his neck. (Tr. 273) In August 2000, Dr. Reat administered trigger point injections and gave the following limitations: no lifting over 20 pounds floor to waist or waist to chest; no lifting over 10 pounds overhead; limited outstretched overhead use of arms; and limited use of vibrating tools. (Tr. 265) Mr. Allred reported continuing neck pain in September 2000; he had been unable to return to a work. (Tr. 264) Dr. Reat recommended chiropractic treatment and stated that he would see Mr. Allred again within the next six months to assess a permanent impairment rating. (Tr. 264)

Dr. Reat completed a medical assessment in October 2003

5

in which he opined that Mr. Allred could occasionally lift or carry ten pounds and frequently lift or carry less than ten pounds, with pushing or pulling with the upper extremities limited to 20 pounds, no postural activities except occasional kneeling, and only occasional reaching. (Tr. 724-27)

Mr. Allred was in a motor vehicle accident in November 2000 and was treated for injuries to his neck. (Tr. 322-28, 340-46) He thereafter developed low back pain. (Tr. 310-12) Dr. Lloyd Walwyn, an orthopedic surgeon, began treating Mr. Allred in March 2001 for low back pain. (Tr. 604) An MRI revealed a broad based disc herniation versus disc protrusion at L5-S1, causing moderate left foraminal stenosis. (Tr. 602) After physical therapy failed to bring about improvement, Dr. Walwyn performed a lumbar laminectomy in May 2001. (Tr. 361-64, 598, 866-77)

In July 2001, Mr. Allred was treated in the emergency room after falling at a gas station. (Tr. 574-75) He was diagnosed with a cervical and lumbar strain and a right knee sprain. (Tr. 575)

Mr. Allred continued to have back pain after surgery. (Tr. 595-602) In December 2001, Mr. Allred reported that shaving or brushing his teeth caused pain in his lower back; he experienced back pain when he pushed the gas pedal when driving. (Tr. 599) He could not vacuum or lift heavy bags of groceries. A repeat MRI was unremarkable. (Tr. 597) In January 2002, Dr.

6

Walwyn opined that Mr. Allred had reached maximum medical improvement with a 10% whole person impairment because his surgery had left him with residual symptoms. (Tr. 597) He prescribed Lortab and Flexeril.

In a letter written in October 2003, Dr. Walwyn opined that Mr. Allred should not perform any repetitive bending, any lifting over 30 pounds, or any prolonged walking or bending. (Tr. 879)

Dr. Marketa Kasalova, Mr. Allred's internist, treated him for problems including diabetes, back and neck pain, and knee pain. (Tr. 613-14, 618-21, 633-34, 637-38, 644-45, 648-51, 654-55, 664-65, 668-69, 735-62) In January 2002, Mr. Allred saw Dr. Kasalova with dry skin on his feet; the skin was cracked, and walking was very uncomfortable. (Tr. 644) Dr. Kasalova referred him to a podiatrist. (Tr. 645) Mr. Allred saw a podiatrist, Dr. Stephen Chapman in January 2002 for dried fissured heels; Dr. Chapman noted that self-care would be hazardous. (Tr. 422)

In April 2002, Mr. Allred was hospitalized due to apparent seizure activity. (Tr. 449-58, 488-90, 498-99) Neurologist Dr. Stephen Chung's impressions included partial seizures with secondary degeneralization, probably idiopathic in type. (Tr. 457) He recommended increasing Neurontin and changing Xanax to Klonopin. (Tr. 457)

Dr. Peter Pick, a neurologist, first saw Mr. Allred in

7

May 2002; his initial impression was that the spells were probably pseudoseizures secondary to diabetes. (Tr. 605-09) When he returned to Dr. Pick in July 2002, Mr. Allred had had a total of five spells since March 2002. (Tr. 707) Dr. Pick opined that these were probably pseudoseizures secondary to mild to moderate anxiety. (Tr. 710). He prescribed Dilantin and Xanax, which helped control Mr. Allred's symptoms. (Tr. 710-11)

Dr. Pick completed a medical assessment in which he specifically described Mr. Allred's lifting and push/pull ability with each hand and opined that he could stand or walk for less than two hours in a workday. (Tr. 703-04) He also stated that seizure precautions were necessary. (Tr. 704-06) Dr. Pick cited chronic right shoulder joint pain due to arthropathy; mild chronic sensorimotor polyneuropathy involving hand and feet due to diabetes mellitus type II; mild chronic lumbosacral spondylitis and left sciatica, status post surgery; and pseudoseizures. (Tr. 704-06)

In September 2002, Dr. Kasalova saw Mr. Allred with painful skin openings on his feet and referred him to a dermatologist. (Tr. 758-59) In October 2002, she noted skin lesions on the bottoms of the feet; in November 2002, Mr. Allred had dry skin and cracks in his feet. (Tr. 754-56) In January 2003, Mr. Allred saw Dr. Vincent Longobardo for diabetic foot care. (Tr. 773) Mr. Allred reported dry, cracked skin on his

8

feet with associated pain.  Dr. Longobardo's examination revealed
scaled skin with numerous cracks and fissures on all plantar
aspects of both feet.  His impressions were tinea pedis, painful
fissured skin, and NIDDM (non-insulin dependent diabetes
mellitus).  Dr. Longobardo prescribed Lamisil and continued use
of Topicort.  (Tr. 773) In February 2003, there was no
improvement.  (Tr. 772) Dr. Longobardo noted that the total
aspect of both feet showed cracking, fissuring, drying, and
scaling; he recommended referral to a dermatologist.  (Tr. 772)

In March 2003, Mr. Allred was treated in the emergency
room for an exacerbation of back pain due to coughing.  (Tr. 804-
06) In June 2003, Mr. Allred was rear-ended in a car accident and
was treated for low back pain and chest pain.  (Tr. 831) Thoracic
spine x-rays showed minimal compression fractures of T6 and T7.
(Tr. 814) Lumbar spine x-rays showed anomalous development of
lumbar spine with transitional vertebra at L5 and an extra lumbar
vertebral segment between T12 and L1.  (Tr. 814)

Dermatologist Dr. Michael Gold undertook treatment of
Mr. Allred's foot problems in June 2003.  (Tr. 783) Walking was
painful for Mr. Allred.  Dr. Gold noted dry scaly xerotic feet;
he gave Mr. Allred a topical medication.  (Tr. 783) At subsequent
appointments, Dr. Gold also administered injections.  Mr.
Allred's foot condition did not respond well to treatment, and he
continued to have significant cracking and thickening of the skin

9

on his feet.  (Tr. 784-86) When he saw Dr. Gold in October 2003, Mr. Allred still had severe fissures on his feet.  (Tr. 786) He reported that he had to crawl to the bathroom at times because his feet were so badly cracked.  (Tr. 786) In November 2003, Mr. Allred continued to have fissures and pain with difficulty walking.  (Tr. 787) Dr. Gold again administered injections and prescribed topical medications.  (Tr. 787)

Dr. Gold completed a medical assessment stating that Mr. Allred could stand or walk for at least two hours in a workday.  (Tr. 780) Dr. Gold opined that Mr. Allred had pain that was often severe enough to interfere with attention and concentration, needed to elevate his legs with prolonged sitting, and was likely to be absent about two times a month.  (Tr. 781) Dr. Gold also described significant environmental limitations. (Tr. 782)

Mr. Allred was treated in the emergency room in October 2003 for an exacerbation of low back pain.  (Tr. 819-21)

In October 2003, Mr. Allred started getting treatment at a pain clinic for low back pain radiating into both legs as well as thoracic back pain.  (Tr. 789) He was given injections. (Tr. 790) The pain clinic discontinued Soma and prescribed Lortab, Baclofen, and Neurontin.  In November 2003, Mr. Allred reported that the muscle relaxers had caused more seizures.  (Tr. 791) The muscle relaxer was discontinued, and Lortab was

10

increased.  (Tr. 792) At this next appointment, Mr. Allred was
referred for cervical facet injections and a cervical MRI.  (Tr.
794)

<u>Mental problems</u>

Mr. Allred's medical history includes treatment for
anxiety by his primary care physician, who prescribed Xanax.
(Tr. 278-79, 281, 284, 287, 289)

Mr. Allred began receiving treatment at Volunteer
Behavioral Health Care Systems in November 2000 for depression
and anxiety.  (Tr. 405-07) Dr. Cynthia Rector performed a
psychiatric evaluation in February 2001.  (Tr. 400) Mr. Allred
described being abused by his stepfather as a child and
witnessing his mother being abused.  He tended to be
hypervigilant and had trouble with nightmares and insomnia.  (Tr.
400) Mental status examination revealed mild tremors in the hands
and mild psychomotor agitation.  (Tr. 402) Dr. Rector gave
diagnoses of PTSD (post-traumatic stress disorder) and anxiety
disorder; Mr. Allred's score on the Global Assessment of
Functioning (GAF) scale was 50, indicating serious psychological
symptoms, with a high of 50 and a low of 45 over the past year.
Dr. Rector prescribed Tervel.  (Tr. 403)

Subsequent treatment records from Volunteer Behavioral
Health Care Systems show that Mr. Allred's GAF remained at level

11

50 until November 2001.  (Tr. 387, 391-94, 397-98)[2]  In January
2003, a CRG assessment showed improvement to a GAF of 60.  (Tr.
723)

William Sewell performed a consultative psychological
evaluation in February 2001.  (Tr. 290) He noted that Mr. Allred
had been taking Xanax for 15 years for anxiety and had recently
been prescribed Serzone.  (Tr. 290) Dr. Sewell did not diagnose
any psychological disorders.  (Tr. 293)

B.  Hearing testimony

At the hearing in December 2003, Mr. Allred testified
that he could not return to work because of back pain, seizures,
diabetes, and cracks in his feet.  (Tr. 31-32, 35) He stated that
his back pain had not improved after surgery.  (Tr. 32) Walking,
standing, or driving caused increased pain.  (Tr. 34) Mr. Allred
could walk for 10 or 15 minutes, stand for 15 to 20 minutes, and
sit for 15 to 20 minutes before the pain got worse.  Lifting a
gallon of milk caused pain.  (Tr. 34)

Mr. Allred testified that he continued to have two or
three seizures a week even on medication.  (Tr. 35) He had a bad
seizure (involving loss of consciousness) every two or three
weeks.  (Tr. 37) He had less severe seizures more frequently.
(Tr. 35) The seizures could be brought on if he moved his head or

_____

[2]After the November 19, 2001 treatment records, there is a break in the
records from Volunteer Behavioral Health Care Systems.  They resume again on
January 22, 2003.  (Tr. 723)  Mr. Allred did receive medical treatment during
the interim period.

12

got up quickly or when he was around fluorescent lights. (Tr. 43)

Mr. Allred stated that he had had problems with cracks in his feet all of his life, but the problem had worsened since he had been diabetic. (Tr. 38) He had more than 50 to 60 cracks in each foot. The cracks would bleed and were painful. (Tr. 38-39) Mr. Allred had difficulty walking at times and sometimes had to crawl to the bathroom. (Tr. 39)

As to his anxiety and depression, Mr. Allred traced his problems to being abused by his stepfather as a child. (Tr. 40) He had difficulty being around people and had poor sleep. Mr. Allred stated that he slept one or two hours a night. (Tr. 40)

Mr. Allred testified that he would lie down off and on all day long to east the pain in his back and feet. (Tr. 40) He had difficulty concentrating and would forget what he was doing. (Tr. 41)

Mr. Allred lived with his mother and did not do housework or yard work. (Tr. 41) His feet hurt and he could not do bending because of his back. Mr. Allred could take out a light bag of trash occasionally. (Tr. 41) He could not vacuum, do dishes, or do laundry. (Tr. 46) His mother and sister did the housework. (Tr. 47) Mr. Allred's sister came to help about three times a week. (Tr. 47) Mr. Allred had problems shaving and showering because of the bending required. (Tr. 42)

13

Mr. Allred did not go to church because he did not want to be around people. (Tr. 42) He seldom went to the grocery store; there had been several occasions when he had seizures while in the store. (Tr. 42) Mr. Allred testified that he occasionally drove, but had just about given up driving because of his fear of seizures. (Tr. 43-44) He had given up his hobbies of hunting, fishing, skating, and bowling. (Tr. 41)

Mr. Allred testified that his medications caused side effects of drowsiness, confusion, and forgetfulness. (Tr. 45)

A friend of the family who saw Mr. Allred frequently (often daily), Rebecca Simmons, testified that she had seen him have seizures and been with him in the store when he felt a seizure coming on. (Tr. 53, 58) She had witnessed two of the grand mal seizures, one at home and one in the store. During a seizure, Mr. Allred jerked all over and his eyes rolled back. (Tr. 53) The last seizure she had seen occurred a few months before the hearing and had lasted about ten minutes. (Tr. 53-54) Ms. Simmons also testified that Mr. Allred was withdrawn and irritable and did not want to be around people. (Tr. 55).

### III. Conclusions of Law

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.

14

<u>Jones v. Sec'y of Health & Human Servs.</u>, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. <u>Landsaw v. Sec'y of Health & Human Servs.</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." <u>Bell v. Comm'r of Soc. Sec.</u>, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. <u>Hurst v. Sec'y of Health & Human Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

B. <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to

engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). At the administrative level

of review, the claimant's case is considered under a five-step

sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes
     substantial gainful activity, benefits are automatically
     denied.
(2)  If the claimant is not found to have an impairment which
     significantly limits his or her ability to work (a "severe"
     impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment,
     it must be determined whether he or she suffers from one of
     the "listed" impairments[3] or its equivalent; if a listing is
     met or equaled, benefits are owing without further inquiry.
(4)  If the claimant does not suffer from any listing-level
     impairments, it must be determined whether the claimant can
     return to the job he or she previously held in light of his
     or her residual functional capacity (e.g., what the claimant
     can still do despite his or her limitations); by showing a
     medical condition that prevents him or her from returning to
     such past relevant work, the claimant establishes a prima
     facie case of disability.
(5)  Once the claimant establishes a prima facie case of
     disability, it becomes the Commissioner's burden to
     establish the claimant's ability to work by proving the
     existence of a significant number of jobs in the national
     economy which the claimant could perform, given his or her
     age, experience, education, and residual functional
     capacity.

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

        The Commissioner's burden at the fifth step of the

_____

        [3]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P,
Appendix 1.

Case 2:06-cv-00007   Document 22   Filed 04/21/08   Page 16 of 32 PageID #: 87

evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. Id.  In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony.  See Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. § 423(d)(2)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C.  Plaintiff's Statement of Errors

Plaintiff alleges error in the ALJ's rejection of at least portions of the assessments of four treating physicians; in his disregard of the evidence of plaintiff's longstanding anxiety

17

disorder and related limitations of mental function; and, in his
rejection of plaintiff's subjective complaints of disabling pain.
As explained below, in light of the undersigned's findings of
error in the ALJ's analysis of plaintiff's physical impairments
and symptoms, reversal of the administrative decision with remand
for further agency proceedings is recommended in this case.

   The Sixth Circuit has noted that ALJs are not bound by
the opinions of treating physicians unless those opinions are
both well supported by objective medical evidence, and not
inconsistent with other substantial evidence of record. <u>E.g.</u>,
<u>Stiltner v. Comm'r of Soc. Sec.</u>, 2007 WL 2264414, *4 (6th Cir.
Aug. 7, 2007)(quoting 20 C.F.R. § 404.1527(d)(2)[4]). However, if
controlling weight is not accorded the opinion of a treating
source, the ALJ must give good reasons for discounting that
opinion, by reference to the following regulatory factors
governing the weighing of such evidence: the length of the
treatment relationship and the frequency of examination, the
nature and extent of the treatment relationship, the nature and
extent of relevant evidence that the treating physician presents
supporting his opinion, consistency of the opinion with the
record as a whole, and the treating physician's specialization.
20 C.F.R. § 416.927(d)(2)-(5); <u>see</u> <u>also</u> <u>Wilson v. Comm'r of Soc.</u>

---

[4]The corresponding regulation which is applicable to Title XVI
applications is 20 C.F.R. § 416.927(d)(2).

18

Sec., 378 F.3d 541, 544 (6th Cir. 2004).

In his analysis of the assessments of Dr. Reat, the orthopedist who treated plaintiff in 2000 for a cervical strain, the ALJ noted on several occasions that the limitations imposed by Dr. Reat were temporary, and that the specialist released plaintiff to return to full work duty without limitation by August 2000 (Tr. 18, 20, 21). As argued by plaintiff (and not opposed by defendant), the ALJ was mistaken in his belief that Dr. Reat released plaintiff without limitation; rather, as of July 2000, Dr. Reat *expected* to give plaintiff such a release (Tr. 268), but that expectation was thwarted by plaintiff's continued cervical pain, prompting Dr. Reat to release him with continued restrictions (Tr. 265), and ultimately to release him from care with recommended followup for symptomatic treatment by a chiropractor (Tr. 264). Accordingly, to the extent the ALJ relied upon this release-to-full-duty factor in rejecting Dr. Reat's 2003 assessment of work restrictions and other more dire assessments of record, such rejection was not supported by good reason.

The ALJ further rejected portions of the assessments of plaintiff's neurosurgeon, Dr. Walwyn, who treated plaintiff's back impairment; another neurologist, Dr. Pick, who was consulted for evaluation of plaintiff's seizure activity; and his dermatologist, Dr. Gold, who treated plaintiff's foot condition

19

after diabetic foot care with Dr. Longobardo yielded no improvement. These physicians each assessed a restriction against prolonged walking, with Drs. Pick and Gold assessing plaintiff's inability to stand or walk for more than 2 hours out of the workday. Dr. Walwyn's assessment of that limitation was based on plaintiff's residual symptoms following his lumbar laminectomy in May 2001 (Tr. 879). The ALJ found that the limitation against prolonged walking was not supported by plaintiff's "treatment notes, subjective history, and his activity level" (Tr. 20), but fails to elaborate on this explanation by citing examples from the record. As further discussed below with regard to the ALJ's credibility finding, it is clear that at least Dr. Walwyn's treatment notes and the history he took from plaintiff support the assessment of limitations based on residual back pain.

Moreover, while the ALJ's treatment of Dr. Pick's assessment (id.) appears to the undersigned to be sufficiently reasoned and supported, the same cannot be said of his treatment of the assessment of yet another specialist, dermatologist Gold. The ALJ rejected Dr. Gold's assessment of plaintiff's inability to stand/walk for more than 2 hours per day, as well as his need to avoid more than occasional climbing and to elevate his legs periodically, reasoning as follows:

> ... Dr. Gold had treated the claimant for a limited
> time period for cracked skin on his feet. The claimant

20

was treated and instructed regarding his foot care. From the medical evidence, he has not had ongoing foot complaints or documented impairments which would impose the other limitations (i.e., walking/standing, climbing, leg elevation) mentioned by Dr. Gold, on an ongoing basis.

(Tr. 20) The record related to plaintiff's problems with fissures on his feet reveals an apparently premorbid problem that worsened with the onset of diabetes (Tr. 38, 422). After presenting with this problem in the office of his internist, Dr. Kasalova, complaining that the pain left him unable to walk, plaintiff was referred to a podiatrist, Dr. Chapman (Tr. 644-45). Dr. Chapman diagnosed dermatitis, tinea pedis, and dried, fissured heels; he noted that "self-care would be hazardous," prescribed medications, and instructed plaintiff in applying occlusive dressings (Tr. 422). Dr. Chapman succeeded in relieving plaintiff's symptoms by about fifty percent, but was unable to resolve what he referred to as "quite a bit of dermatitis." (Tr. 422) Dr. Chapman recommended that plaintiff be seen by a dermatologist (Tr. 421-22).

However, the next time plaintiff presented to Dr. Kasalova with painful, fissured skin on his feet, in September 2002 (Tr. 758-59), he was referred to another podiatrist, Dr. Longobardo, for routine diabetic foot care (Tr. 772-73). Dr. Longobardo diagnosed tinea pedis, painful fissured skin, and NIDDM, as well as unspecified dermatitis. (<u>Id.</u>) Dr. Longobardo's treatment yielded no improvement in plaintiff's

21

symptoms, prompting Dr. Longobardo to recommend consultation with a dermatologist after noting that the "[t]otal plantar aspect of left and right foot shows cracking, fissuring, dryness and scaling." (Tr. 772)

Plaintiff was thereafter referred to Dr. Gold, who treated plaintiff's foot condition from June through November of 2003 (Tr. 783-87), and who in December 2003 assessed the aforementioned limitations on standing/walking and other work-related issues which plaintiff would be expected to face on account of his foot problems (Tr. 780-82). The ALJ dismissed Dr. Gold's assessment after noting that plaintiff was "treated and instructed regarding his foot care," and that the medical evidence does not reveal ongoing complaints or impairments which would support the limitations assessed by Dr. Gold. (Tr. 20) However, it does not appear by any means that the treatment and instruction provided by Dr. Gold resolved plaintiff's problems, as the ALJ implies. Rather, Dr. Gold's treatment notes are checkered with observations such as "dry scaly keratotic feet," "xerosis to feet," "very dry," "[xerosis] still active," "still [with] significant cracking and thickened skin @ feet," "feet still [with] severe fissures," and "continues [with] fissures"; these notes also reflect plaintiff's constant complaint that his foot problems caused pain with walking, at one point to such an extent that he had to crawl instead of walk to the bathroom in

22

his home. (Tr. 783-87) While true that Dr. Gold only treated plaintiff for six months, the medical record documents the persistence of plaintiff's foot problems since at least January 2002, and Dr. Gold's treatment notes do not provide any reason to believe that he expected their resolution imminently. Moreover, the undersigned fails to see the disconnect between the documented condition of dry, fissured feet and a significant limitation on standing/walking; the ALJ's conclusion in this regard is at best inadequately explained. It would appear that the medical evidence of this apparently painful condition, the doctors' assessments of a standing/walking limitation to two out of eight hours, and plaintiff's testimony that he can stand and walk roughly 15-20 minutes at a time (Tr. 34) are in harmony, and the ALJ's contrary finding is not adequately supported.

These analytical shortcomings are compounded in the ALJ's discussion of the credibility of plaintiff's subjective pain complaints (Tr. 21-22). While the ALJ's finding on the credibility of witnesses before him is entitled to significant deference on judicial review, his explanation for discrediting a witness must nonetheless be reasonable and supported by substantial evidence. Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). The following excerpt contains the ALJ's explanation for discrediting plaintiff's subjective complaints, and is the sum and substance of his decision to deny

23

benefits:

Using the criteria outlined in Social Security
Regulations 404.1529 and 416.929 and Social Security
Ruling 96-7p, I find that the claimant has not
experienced any pain or other symptomatology of a
disabling level of severity on an ongoing basis.  The
evidence reveals that the claimant quit work because
his employer put him back to a heavier job than he was
supposed to [have] performed while he was recovering
from a cervical strain and in order to care for his
mother, rather than due to an inability to engage in
substantial gainful activity.  **He was approved for a
return to full duty work within a few months of his
cervical strain**.  His anxiety-depression has remained
stabilized,[5] and has not prevented him from engaging in
substantial gainful activity in the past.  After being
injured in a motor vehicle accident, he required back
surgery in mid-2001.  **However, he recovered and was
released from treatment.  In contrast to his testimony,
he did not visit physicians voicing any complaints of
ongoing back pain**.  The evidence fails to establish
that he "broke his back" in 2003, which he alleged at
his hearing.  He has not required any further back
surgery, nor are there tests establishing the presence
of any impairment such as a herniated disc with nerve
root compression which might cause a disabling level of
pain.  **The treatment notes fail to document abnormal
physical findings suggestive of a disabling level of
pain**.  He was treated with medication such as Lortab
after complaining of injuring his back most recently in
2003.  The evidence fails to document that he

---

[5]Plaintiff argues that the evidence of his mental impairment was
improperly discounted as showing a condition that has "remained stabilized,"
since his mental health care providers rated him as suffering seriously
impaired functioning, or at least serious symptoms of anxiety, for the large
majority of 2001 (see Tr. 385-403, reflecting consistent GAF scores of 50).
However, despite giving nominal credence to the consultative examiner's
finding of no significant mental limitations (Tr. 18, 290-93) and the
nonexamining consultant's opinion that plaintiff's mental impairment was
nonsevere (Tr. 18, 294), the ALJ nonetheless incorporated moderate
psychological limitations into his RFC finding and his questioning of the
vocational expert, consistent with substantial evidence of record including
the assessments of his treating source upon intake in November 2000 (Tr. 406),
the nonexamining consultant's assessment in April 2002 (Tr. 441, 443, 445-46),
and his treating source assessments in 2003 (Tr. 717-23, 728-31).  The
undersigned finds no error in the ALJ's treatment of plaintiff's mental
impairment or his resulting functional limitations.

24

experiences any significant side-effects from treatment, and his medications could be adjusted or changed if he did have any side-effects. There are no diagnostic test results or examination findings documenting that he has severe neuropathy of the extremities that would impose significant work-related limitations of function. The evidence documents that he had pseudoseizures occurring in the spring of 2002, subsequently noted to be controlled. Several of the treating and other physicians of record have indicated that Mr. Allred retains the capacity to perform some level of work. The evidence indicates that the claimant has engaged in activities such as caring for his mother, driving, shopping, lifting furniture, picking beans, raking leaves, etc., despite his various complaints. The claimant has cared for his mother for years, emphasizing at his hearing how feeble she is. The evidence indicates that there is some secondary gain from the claimant's physical complaints, with there being a history of lawsuits and at least one financial settlement. He has alleged experiencing a number of falls in businesses, along with experiencing multiple automobile accidents. Although the claimant may feel disabled because he cannot do his former heavy work as a heating and air conditioner installer, this does not justify a finding of disability as that term is defined in the Social Security Act. He and his mother are able to live on his mother's Social Security benefits.

(Tr. 21-22)(emphases supplied)

        The bolded sentences above are highlighted for their misleading character or, in some instances, sheer inaccuracy. As previously discussed, plaintiff was not released to full duty work from his treatment for a cervical strain. While plaintiff was released from treatment of his lower back symptoms by Dr. Walwyn, this release was certainly not without limitation or otherwise indicative of the full recovery that the ALJ implies. Indeed, Dr. Walwyn discharged him in January 2002 with new prescriptions for the narcotic Lortab and the muscle relaxant Flexeril, after "[e]xamination reveal[ed] that his low lumbar

region still has some spasm left laterally, [and] his left straight leg raise test causes mild back pain but no sciatica." (Tr. 597)[6]  Contrary to the ALJ's finding of no further complaints of back pain on visits to his physicians, plaintiff in fact was subsequently diagnosed with degenerative joint disease and associated pain and muscle spasm in the low back by Dr. Kasalova (Tr. 639), who made note of this chronic condition as a presenting problem throughout 2002 and 2003 (Tr. 614, 633, 733-63), and even planned to send plaintiff to a pain clinic as early as October 2002 (Tr. 757, 751).[7]

As to the noted absence of objective test results establishing what the ALJ deems to be a significant back impairment, or abnormal physical findings suggestive of disabling pain, the undersigned views the record differently.  While

---

[6]Dr. Walwyn further reported, albeit in a letter to the attorney representing plaintiff in matters unrelated to his social security applications, that plaintiff has "been bothered by disabling back pain" since shortly after his May 2001 surgery, and that as of his release from care in January 2002, "[h]e was still experiencing pain of his left lower back region and his feet, and pain when he coughed."  (Tr. 595-96)

[7]Speaking of plaintiff's referral to a pain clinic, the only mention made by the ALJ regarding plaintiff's treatment at the Spectrum Pain Clinic on three occasions in late 2003 (Tr. 789-94) was that he was prescribed "medication such as Lortab ... [but] did not require hospitalization or back surgery."  (Tr. 19)  Closer scrutiny reveals that clinic physicians diagnosed plaintiff with lumbar post-laminectomy syndrome and cervical, thoracic, and lumbar back pain, as well as neuropathic and radicular leg pain; on examination they noted pain on thoracic and lumbar range of motion testing, as well as muscle spasms, signs of impingement, and positive results bilaterally on administration of Fabere's test, lateral iliac compression test, and straight leg raise test.  (Id.)  After local injections of painkilling medicines provided relief from plaintiff's symptoms for only four days, the clinic physicians resumed treatment with Lortab (Tr. 792) and referred plaintiff for further workup of his cervical spine impairment and symptoms (Tr. 794).

26

plaintiff's lumbar laminectomy appears to have succeeded in remedying the mechanical defect (the disc protrusion) as intended, it is clear that the surgeon himself only considered the surgery partially successful, in line with followup examination results documenting plaintiff's continuing muscle spasm and limited range of motion in the region, as well as positive results on straight leg raise testing (Tr. 597-601). After noting his concern and confusion over the amount of postoperative pain plaintiff consistently reported experiencing (Tr. 600), which prompted a repeat lumbar MRI that proved benign, Dr. Walwyn discharged plaintiff with the diagnosis of "Surgically treated disk lesion with residual, medically documented pain and rigidity." (Tr. 596) The documentation of plaintiff's pain complaints in the lower back/hip region includes, at different times, clinical findings of spasm, pain-limited range of motion, and reproduction of pain using straight leg raise testing and other maneuvers including Lasegue's testing (Tr. 600), Fabere's testing, and iliac compression testing (Tr. 790). In addition, a further radiology report on x-rays taken in June 2003 revealed "an additional lumbar vertebral segment between T12 and L1 and a partially sacralized L5 segment[,] [p]artial left laminectomy defect at L5[,] [s]traightening of lumbar lordotic curvature." (Tr. 771)

     In short, while the ALJ faults plaintiff for claiming

27

disability just because he cannot do his former heavy work installing air conditioners (Tr. 21), conversely, the undersigned finds fault in the ALJ's apparent belief that an impairment which does not require hospitalization and emergency surgery cannot justify a finding of pain-related disability (Tr. 19, 21). The ALJ further claims to rely upon nonmedical evidence of secondary gain from other legal pursuits, as well as plaintiff's activities including "caring for his mother, driving, shopping, lifting furniture, picking beans, raking leaves, etc." (Tr. 21) However, at least with regard to picking beans, raking leaves, and similar pursuits, the record evidence establishes that plaintiff was only able to engage in such activities briefly, and suffered great pain as a result of these attempts (Tr. 599, 601). The ability to engage (or attempt to engage) in such activities intermittently due to pain, when such endeavors are not overly difficult in any event, is not inconsistent with plaintiff's disability claim. E.g., Walston v. Gardner, 381 F.2d 580 (6th Cir. 1967). Plaintiff's driving also appears to be limited on account of the low back pain it causes (Tr. 601), and the extent to which plaintiff exerts himself in caring for his sick mother is questionable in light of plaintiff's testimony and other statements, though there is evidence that he is able to so some household chores (Tr. 46-47, 291).

Clearly though, considering plaintiff's combination of

28

back and foot impairments, the limitation to standing and/or walking only 2 out of 8 hours is substantially supported by both the medical and testimonial record. When considered against the evidence opposing it on the record as a whole, the ALJ's reliance on the assessments of nonexamining agency consultants and his own credibility determination to establish plaintiff's residual functional capacity for a range of light work requiring the ability to stand/walk for 6 out of 8 hours is simply not substantially supported.[8]

Finally, though plaintiff has not raised the issue, it appears that the ALJ's reliance on the testimony of the vocational expert to meet his burden at step five of the sequential evaluation process is undermined by his failure to include all relevant limitations in his hypothetical question to that expert. Such a hypothetical, in order to elicit vocational testimony upon which the ALJ is entitled to rely, must incorporate all of the claimant's limitations as found by the ALJ in his assessment of plaintiff's RFC, i.e., his assessment of what plaintiff can and cannot do. Webb v. Comm'r of Soc. Sec.,

---

[8]The undersigned notes here his agreement with plaintiff's counsel that, to the extent the ALJ may have accorded less weight to plaintiff's submission of treating source statements because they were obtained "[i]n anticipation of the claimant's December 2003 disability hearing ... in an effort to bolster his claim for disability benefits" (Tr. 19), such derision would improperly punish plaintiff merely for attempting to carry his burden. Furthermore, the ALJ's final notation in explaining his adverse credibility finding -- that "[plaintiff] and his mother are able to live on his mother's Social Security benefits" (Tr. 22) -- is entirely inapposite to any issue in these proceedings.

Case 2:06-cv-00007   Document 22   Filed 04/21/08   Page 29 of 32 PageID #: 100

368 F.3d 629, 632-33 (6th Cir. 2004)(<u>citing</u>, <u>e.g.</u>, <u>Foster v.</u>
<u>Halter</u>, 279 F.3d 348, 356 (6th Cir. 2001)).

Here, the ALJ found that plaintiff had the residual
functional capacity to engage in a limited range of light work.
Light work is defined in the regulations as work which involves
lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds.  20 C.F.R. §§
404.1567(b), 416.967(b).  However, the ALJ determined that the
range of light work plaintiff could perform was limited in part
by his inability to lift more than 10 pounds (Tr. 22, 23).
Unfortunately, in questioning the vocational expert, the ALJ
failed to include this 10-pound lifting restriction among the
other hypothetical factors which informed the expert's
identification of suitable light jobs.  (Tr. 59-60; <u>see</u> <u>also</u>
Docket Entry No. 19 at 10)  This omission prevents the agency
from relying upon the significant number of light jobs
identified, as the expert did not otherwise clarify whether these
jobs required lifting items weighing between 10 and 20 pounds.
Whether or not the sedentary jobs identified on this record would
have sufficed to satisfy the Commissioner's burden is a moot
question in view of the other errors identified above.

In sum, the undersigned finds reversible error in the
decision of the Commissioner, which is not supported by
substantial evidence on the record as a whole.  Accordingly, that

Case 2:06-cv-00007   Document 22   Filed 04/21/08   Page 30 of 32 PageID #: 101

decision should be reversed, with remand of the matter for further administrative proceedings upon an updated record, to include rehearing.

## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **GRANTED**, and that the decision of the Commissioner be **REVERSED** and the cause **REMANDED** for further proceedings consistent with this report, to include rehearing.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 21st day of April, 2008.

31

s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

Case 2:06-cv-00007   Document 22   Filed 04/21/08   Page 32 of 32 PageID #: 103